Anne C. Ronan (006041)
Samuel Schnarch (036587)
**ARIZONA CENTER FOR LAW**
  **IN THE PUBLIC INTEREST**
352 E. Camelback Rd., Suite 200
Phoenix, AZ  85012
T:  (602) 258-8850
F:  (602) 926-0214
aronan@aclpi.org
sschnarch@aclpi.org

Eleanor Hamburger (26478)
**SIRIANNI YOUTZ SPOONEMORE**
  **HAMBURGER PLLC**
3101 Western Avenue, #350
Seattle, WA  98121
T:  (206) 223-0303
D:  (206) 838-1809
F:  (206) 223-0246
ehamburger@sylaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| E.W. by and through his parents JONATHAN WARD and EVA LORANE WARD and A.V. by and through her parents, NICOLE VALENZUELA and DAVID ANTHONY VALENZUELA,<br><br>Plaintiffs,<br><br> v.<br><br>DIGNITY HEALTH OF ARIZONA and Dignity Health Arizona Preferred Plan,<br><br>Defendants. | **COMPLAINT** |

## I.    PRELIMINARY STATEMENT

1.    This case is brought on behalf of two children, E.W. and A.V., who have been diagnosed with developmental mental health conditions including Autism Spectrum Disorder (ASD), and who are beneficiaries of the Dignity Arizona Preferred Plan (the Plan). This case is brought to prevent Dignity Health of Arizona (Dignity) and its agent and claims administrator, UMR, from discriminating against children with developmental mental health disorders in the provision of employee health benefits.  Early and effective provision of medically necessary evaluation and treatment for developmental mental health conditions like ASD can dramatically improve the health of young children and reduce the long-term disabling effects of the conditions.  Unfortunately, Dignity's Plan excludes all therapy services for the treatment of delays in development.

2.    Professional services necessary to diagnose developmental mental health disorders, including ASD, are critical to ensuring early treatment and the reduction of long term disability.

3.    Occupational therapy and speech therapy services reinforce a child's typical developmental trajectory by helping to develop communicative and daily-life skills. Therapy services benefit an individual's healthy cognitive development and prevent or minimize the potential for developmental delay. *See: https://aaspeech.com/speech-occupational-therapists-help-with-developmental-disabilities-and-delays/* (last visited August 5, 2021).  Early application of occupational and speech therapy services can also prevent long term delays and ensure steady development in an individual's capacity. In many cases, an individual may exhibit developmental delays at an early age, prior to when a diagnosis of ASD is typically possible. In those cases, as well as when there is no ultimate ASD diagnosis, the provision of occupational and speech therapy services can prevent potentially larger impacts on the individual's skills and abilities in the future. *See also*: *https://nyulangone.org/conditions/developmental-delays-in-children/treatments/therapy-for-older-children-with-developmental-delays*. (Last visited August 5, 2021)

4.     Prior to and following their diagnosis of ASD, both E.W. and A.V. were evaluated for the presence of a developmental mental health disorder. The professionals established that each child suffered from a developmental mental health disorder requiring treatment. These disorders resulted in delays in their development and each child was prescribed and received medically necessary treatment to address these conditions. Defendants denied coverage for the evaluations and the treatment services based upon an exclusion in the Plan for "Therapies for the Treatment of Delays in Development." (the "Developmental Delay Exclusion").

5.     Defendant Dignity's benefit design and the application of the Developmental Delay Exclusion violates Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. §18166, since the denials of coverage for the services were based solely upon Plaintiffs' diagnosis considered by Dignity to be "Developmental Delays."

6.     Dignity also violates the Mental Health Parity and Addiction Equity Act (MHPAEA), 29 U.S.C. §1185a, since Dignity both facially and as applied, impose the Developmental Delay Exclusion exclusively or predominantly on developmental mental health conditions, while, at the same time, covering the same or similar services for medical/surgical conditions.  On its face, the Developmental Delay Exclusion does not apply to, and therefore permits, coverage of therapy services to address medical/surgical conditions that result from acute illness, injury or congenital defects amenable to surgical repair.  *See **Appendix A***, p. 68, ¶83 (Dignity Health Arizona Preferred Plan description of Developmental Delay Exclusion).  At the same time the Exclusion eliminates coverage for developmental mental health conditions.  *Id.*

7.     Plaintiff E.W. is a beneficiary of the Plan through his father and has been diagnosed with developmental delays and ASD.  His father, Jonathan Ward, is an employee of Chandler Regional Hospital which is owned by Dignity. Mr. Ward receives health coverage for E.W. through the Dignity Plan as part of his employment.

8.      Plaintiff A.V. was a beneficiary of the Plan through her mother and has been diagnosed with developmental delays and ASD.  Nicole Valenzuela, A.V.'s mother, is a former employee of Dignity. During the relevant time period, Ms. Valenzuela was employed as a telemetry nurse at the Mercy Gilbert Hospital owned by Dignity and received health coverage for A.V. under the Plan pursuant to her employment.

9.      Both Plaintiffs E.W. and A.V. were prescribed and began receiving treatment to address their developmental delays before they had been diagnosed with ASD. Both have continued to receive treatment following their ASD diagnoses. Coverage of these services was denied by Defendant due solely to their diagnoses with conditions that Defendants maintain are "Developmental Delays:"  *See **Appendix B (UMR Denial Notices)**.*  Both E.W.'s and A.V.'s denials were based upon a general Plan exclusion for Therapies for the Treatment of Delays in Development:

> **Therapies for the Treatment of Delays in Development.**  Unless resulting from acute illness of injury or congenital defects amenable to surgical repair (such as cleft lip/palate), are not covered.  Examples of non-covered diagnoses include Down syndrome and cerebral palsy, as they are considered both developmental and/or chronic in nature.

*Appendix A,* p.68.  The sentence fragment above is the language that appears in the Plan document.

10.      E.W.'s parents were forced to pay for treatment themselves out-of-pocket without coverage from the Plan.

11.      A.V.'s parents were unable to afford continued treatment once coverage for her therapy was denied.  As a result, A.V. was forced to stop treatment August 2020.

12.      In September 2020, Plaintiff A.V. was able to enroll in Arizona's Medicaid program ("AHCCCS").  She began receiving treatment services in October 2020 through AHCCCS.

13.      Although Plaintiff A.V.'s services have resumed, she experienced a significant regression in her abilities due to the lack of treatment.

14.    Plaintiffs seek coverage of their medically necessary therapy services to treat their developmental mental health conditions.

15.    Defendant's benefit design and application of the Developmental Delay Exclusion violates Section 1557 of the Patient Protection and Affordable Care Act (ACA) because it discriminates against them solely on the basis of their disabilities.

16.    Additionally, the Developmental Delay Exclusion violates MHPAEA because, facially and as applied, it is imposed exclusively or predominantly on developmental mental health conditions, while, at the same time, Defendants cover the same or similar services for medical/surgical conditions.

## II.    JURISDICTION AND VENUE

17.    This action arises under both Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 and ERISA § 502(e) (1) and (2), 29 U.S.C. §§ 1132(a) (1) (B) and (a) (3).

18.    This court has jurisdiction over claims brought under Section 1557 of the Patient Protection and Affordable Care Act pursuant to 28 U.S.C.A. § 1331.

19.    Venue is proper in this court because Defendant Dignity provides health care in Arizona, the Plan is administered in Arizona, this is the jurisdiction in which the events which gave rise to the claim occurred, and the Defendant can be found in Arizona.

## III.    PARTIES

20.    Plaintiff E.W. is a beneficiary, as defined by the Employment Retirement Security Act of 1974 (ERISA) § 3(8), 29 U.S.C. § 1002(8), of the Plan because he has been designated by his father to receive benefits under the Plan and fits within the "Child" category of eligible dependents under the terms of the Plan.

21.    Plaintiff A.V. was a beneficiary, as defined by ERISA § 3(8), 29 U.S.C. § 1002(8), of the Plan because she had been designated by her mother to receive benefits under the Plan and because she fits within the "Child" category of eligible dependents under terms

of the Plan. In September 2020, A.V.'s health coverage through the Plan terminated when her mother left employment through Dignity.

22.    Defendant Dignity is the fifth largest health system in the nation with hospitals and providers in over 21 states with multiple hospitals and medical centers in Arizona. Dignity is a covered "health program or activity" that must comply with the anti-discrimination provisions of the ACA.  It is also the "Plan Sponsor" and a named fiduciary of the Plan under ERISA.  As "Plan Sponsor" Dignity designs the benefits to be offered under the Plan.  Dignity is also the "Plan Administrator" of the Plan.

23.    Defendant's Plan, Dignity Health Arizona Preferred Plan (the Plan) is an employee welfare benefit plan under ERISA which is administered by Dignity's agent, UMR. For the purposes of the Complaint, Dignity, UMR and the Plan are collectively referred to as "Dignity."

I**V. FACTUAL ALLEGATIONS**

A.    **Plaintiffs**

24.    Plaintiff E.W. is a four-year-old child who was diagnosed with ASD on November 3, 2020 by Dr. Mark Ruggiero. *See Appendix C*. (Dr. Ruggiero's report).

25.    E.W. demonstrated normal development until he was 18 months old, at which point his skill development began to plateau and regress. Prior to being diagnosed with ASD, E.W. was diagnosed with mixed receptive/expressive language disorder, expressive speech delay, and Social (Pragmatic) Communication disorder. These disorders constitute language or communication disorders which are recognized as developmental mental health disorders in the *Diagnostic and Statistical Manual of Mental Disorders*, 5th edition (DSM-5). https://drive.google.com/file/d/1IrsBbuGJ0roMwc62F76bRrnE_zNG-md2/view?usp=sharing

26.    E.W. has also been diagnosed with decreased fine motor skills, visual motor functioning, and core strength. These diagnoses constitute Motor disorders which are recognized as neurodevelopmental disorders in the DSM-5.

27.    At roughly two-and-a-half years old E.W. was prescribed speech therapy (ST) and occupational therapy (OT) treatment by Phoenix Children's Hospital Outpatient Rehab Clinic.  He began receiving the services in January of 2020. Following his ASD diagnosis E.W. has continued to receive ST and OT treatment.

28.    E.W. was evaluated for a hearing disorder on March 20, *2020*.  *See*, ***Appendix D,*** (Phoenix Children's Hospital Audiology report)*.*

29.    Dignity denied coverage for the ST, OT and the hearing disorder evaluation, stating that E.W.'s records did not demonstrate that E.W. had received these services in response to "an illness, injury, or post-surgical state leading to a need for direct ST and OT services."  Dignity denied the services because the ST, OT, and hearing evaluation services were provided to treat a developmental mental health condition and not a physical illness, injury, or recovery from surgery.

30.    Plaintiff E.W. timely appealed the denial. *See **Appendix E***, (E.W. appeals dated 5/19/20, 8/19/20 and 11/4/20).

31.    On December 22, 2020, Dignity denied E.W.'s appeal. E.W. has exhausted his internal administrative appeals.

32.    Plaintiff A.V. is a three-year-old child.  A.V. experienced developmental delays in speech and language skills, social skills, and motor skills, decreased postural control, poor visual motor integration, as well as delays in sensory processing and motor planning. She was initially diagnosed with Mixed Expressive and Receptive Language Delay, Social (Pragmatic) Communication Disorder, and moderate to severe sensory motor-based feeding disorder.

33.    The above disorders constitute communication, motor and feeding disorders which are recognized as developmental mental health conditions in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5").

34.    A.V. received a speech evaluation in September of 2019. *See **Appendix F*** (Piller Child Development Speech Evaluation). Plaintiff A.V. received ST services from

December 10, 2019 until January 2, 2020, when her treatment was postponed due to a lack of providers. After being placed on a waitlist for treatment, A.V. resumed ST treatment in July of 2020.

35.    Dignity covered the cost of her Speech Therapy services.

36.    A.V. was evaluated for OT and feeding therapy services on December 31, 2019.  *See Appendix G*, (Pillar Child Development Occupational Therapy Evaluation). A.V. received bi-weekly OT services from January of 2020 until July of 2020. She also received once-weekly feeding therapy beginning in February of 2020 until the end of March 2020.

37.    Dignity covered the Occupational therapy and feeding therapy services until May 2020.  *See Appendix H*, (UMR Explanation of Benefits for services rendered 3/4/20, 5/1/20 and 5/8/20).

38.    Starting in May of 2020, and *continuing* through July 2020, Dignity denied A.V.'s OT services based on the Developmental Delay Exclusion.  *See Appendix I*, (UMR Explanation of Benefits for services rendered 5/22/20 through 7/23/20).

39.    A.V.'s parents stopped her OT services in August of 2020 because they could no longer afford it without coverage.

40.    A.V. was evaluated by Dr. Charissa P. Pe Benito, and developmental pediatrician on July 9, 2020 and diagnosed at risk for Autism Spectrum Disorder. *See Appendix J*, (Melmed Center report of consultation).  Dignity denied coverage for this evaluation based on the Developmental Delay Exclusion.  *See, Appendix K*, (UMR Explanation of Benefits services rendered 7/9/20).

41.    In September 2020, A.V's mother left her employment with Dignity.

42.    In September 2020, A.V. was approved for coverage in Arizona's Medicaid program, AHCCCS, which covers medically necessary treatment for developmental delays. She resumed O.T. in October of 2020 through AHCCCS.

43.     A.V. was diagnosed with ASD on November 1, 2020 by Dr. Lori Long.  *See Appendix L*, (Prism Psychological Evaluation Report).

44.     Dignity continued to exclude A.V.'s medically necessary Occupational Therapy, as well as evaluations, even after she was diagnosed with ASD.

45.     A.V.'s parents filed timely appeals on November 4, 2020 and November 9, 2020. *See Appendix M*, (A.V. appeals dated 11/4/20 and 11/9/20).

46.     Due to the Developmental Delay Exclusion, A.V. was without medically necessary therapies from August 2020 until October 2020 and experienced a significant regression in her skills and abilities.

47.     A.V. has exhausted her available internal claims and appeals.

**B.     The Plan**

48.     Dignity's Plan includes an affirmative grant of coverage for both ASD treatment and mental health treatment.   Specifically, the Covered Medical Benefits include:

> **Autism Spectrum Disorders (ASD) Treatment**, when Medical Necessity is met.
>
>> ASD Treatment may include any of the following services:
>> Diagnosis and Assessment;
>> Psychological, Psychiatric, and Pharmaceutical (medication management) care;
>>
>> ***Speech Therapy, Occupational Therapy, and Physical Therapy***; or Applied Behavioral Analysis (ABA) Therapy.
>> Treatment is prescribed and provided by a licensed healthcare professional practicing within the scope of their license (if ABA therapy, preferably a Board Certified Behavior Analyst, BCBA).
>> Treatment is subject to all other plan provisions as applicable (such as Prescription benefit coverage, Behavioral/Mental Health coverage and/or coverage of therapy services).
>> Does not include services or treatment identified elsewhere in the Plan as non-covered or excluded

*Appendix A*, pp. 20-21, ¶8 (emphasis added).

The Plan's Mental Health coverage is defined as follows:

> **Mental Health Benefits**
> The Plan will pay for the following Covered Expenses for services authorized by a Physician and deemed to be Medically Necessary for the treatment of a Mental Health Disorder…

*Id.,* p.49.  The term "mental health disorder" is broadly defined:

> **Mental Health Disorder** means a disorder that is clinically significant psychological syndrome associated with distress, dysfunction or illness.  The syndrome must represent a dysfunctional response to a situation or event that exposes the Covered Person to an increased risk of pain, suffering, conflict, illness or death.

*Id,* p. 89.

49.    Based upon this Plan language, Plaintiffs medically necessary ST, OT, feeding therapy and related evaluations are affirmatively covered under the terms of the Plan, as "mental health service" before they were diagnosed with ASD.  After Plaintiffs were diagnosed with ASD, their services should have been covered as "ASD Treatment."

50.    Despite the specific affirmative grant of coverage under the Plan, Dignity relied upon a general Developmental Delay Exclusion to deny all coverage for their therapy services.  *See Appendix* **A**, p. 68.  As noted above, the Developmental Delay Exclusion is ambiguous at best, defined by a sentence fragment that appears to be missing critical text before the words "are not covered." *See id.*

51.    The Developmental Delay Exclusion appears to exclude services only when provided to treat certain unidentified conditions that Dignity deems to be "developmental delays."  There is no generally available list of the conditions to which Defendant apply the Developmental Delay Exclusion, apart from the two examples provided, Down Syndrome and cerebral palsy.

52.    All of the disputed denials were denied based on the Developmental Delay Exclusion.

53.    Plaintiffs attempted, pre-litigation, to obtain information about how Defendant administered the Developmental Delay Exclusion.

54.     Plaintiffs' counsel wrote Dignity requesting a complete copy of each Plaintiffs administrative file **and** a copy of the Non-Quantitative Treatment Limitation analysis undertaken by Defendant to justify the Developmental Delay Exclusion. *See **Appendix N**,* (Arizona Center for Law letters to UMR dated 3/3/20 and 3/4/20). The Analysis must be conducted and disclosed upon request pursuant to 29 U.S.C. 1185a and its implementing regulations.

55.     Although the requests were received by Dignity, it only provided the Plaintiffs' administrative records.

56.     Plaintiffs' counsel submitted a second round of letters to Dignity requesting the Analysis and a list of the diagnoses to which Defendant applied the "Developmental Delay Exclusion." Dignity did not respond to the second round of letters. *See **Appendix O**,* (Arizona Center for Law letters dated 6/3/20 and 8/9/20).

57.     Dignity never produced any Non-Quantitative Treatment Limitation analysis related to the Developmental Delay Exclusion nor the list of exclusions to which it applies. Based upon Dignity's failure to produce the legally-required disclosure, Plaintiffs assume that no such analysis was undertaken.

C.     **CLASS ALLEGATIONS**

58.     ***Definition of Class***. Plaintiffs propose the following class:

All individuals who:

(1) have been, are, or will be participants or beneficiaries under the Dignity Health Welfare Benefit Plan; and

(2) who have received, require, or are expected to require therapies to treat their developmental delay conditions that Defendant consider to be excluded pursuant to the Plan's Developmental Delay Exclusion.

59.     ***Size of Class***. The class of persons who have received, require or are expected to require therapies to treat their developmental delay conditions subject to the Developmental Delay Exclusion is expected to number in the hundreds and is so large that joinder of all members is impracticable.

11

60.    ***Class Representatives E.W. and A.V.***  Named plaintiff E.W. is an enrollee in the Plan and A.V. is a former enrollee in the Plan.  E.W. and A.W. are diagnosed with ASD, a mental health condition that defendant considers to be a "developmental delay."  Both E.W. and A.V. needed and continue to need therapy services to treat their ASD.  Defendant denied the requests for coverage of therapy services for E.W. and A.V. as excluded under the Plan pursuant to the Developmental Delay Exclusion.  Their claims are typical of the claims of the other members of the class, and through their parents, they will fairly and adequately represent the interests of this class.

61.    ***Common Questions of Law and Fact***.  This action requires a determination of whether Dignity's application of contract provisions, policies and practices that deny, exclude and/or limit coverage of services to treat conditions considered to be "Developmental Delays" violates the Affordable Care Act's Section 1557, MHPAEA and its implementing regulations, and the terms of the Plan as modified by the Federal Parity Act.  Adjudication of these issues will in turn determine whether Defendant is liable for these acts and omissions.

62.    Specifically, the common questions include at least the following:  (1) does the Affordable Care Act's Section 1557 prohibit Dignity from designing and administering a blanket exclusion of all coverage for "developmental delays" because it is a form of intentional disability discrimination?  (2)  Is the Developmental Delay Exclusion facially a separate exclusion applicable only to mental health conditions?  (3) Does Dignity apply the Developmental Delay Exclusion as a separate exclusion applicable to only mental health conditions?  (4) Does Dignity apply the Developmental Delay Exclusion more restrictively to mental health conditions than the predominant treatment limitations applied to substantially all medical/surgical services?

63.    ***Separate suits would create risk of varying conduct requirements***.  The prosecution of separate actions by class members against Dignity would create a risk of inconsistent or varying adjudications with respect to individual class members that would

12

establish incompatible standards of conduct. Certification is therefore proper under Federal Rule of Civil Procedure 23(b)(1).

64. ***Defendant has acted on grounds generally applicable to the class.*** Dignity, by applying policies and practices that result in the improper exclusion and limitation of therapies to treat conditions considered to be Developmental Delays, has acted on grounds generally applicable to the class, rendering declaratory relief appropriate respecting the entire class. Certification is therefore proper under Federal Rule of Civil Procedure 23(b)(2).

65. ***Questions of law and fact common to the class predominate over individual issues.*** The claims of the individual class members are more efficiently adjudicated on a class-wide basis. Any interest that individual members of the classes may have in individually controlling the prosecution of separate actions is outweighed by the efficiency of the class action mechanism. Upon information and belief, there is no pending class action suit filed against this Defendant for the same relief requested in this action.

66. ***Venue.*** This action can be most efficiently prosecuted as a class action in the federal district of Arizona, where the discrimination and violations of the Parity Act occurred and where Plaintiffs reside. Issues as to Dignity's conduct in applying standard policies and practices towards all members of the class predominate over questions, if any, unique to members of the class. Certification is therefore additionally proper under Federal Rule of Civil Procedure 23(b)(3).

67. ***Class Counsel***. Plaintiffs have retained experienced and competent class counsel.

## V. STATUTORY AND REGULATORY FRAMEWORK

### A. Patient Protection and Affordable Care Act [ACA] Section 1557

68. Section 1557 of the ACA explicitly prohibits discrimination in "health programs or activities" any part of which, receives federal financial assistance:

[A]n individual shall not, on the ground prohibited under … section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or

13

activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).

42 U.S.C. 18116a

69.     Dignity is principally engaged in the business of providing healthcare and health coverage a part of which receives federal financial assistance in the form of Medicaid and Medicare payments.  Dignity is a covered health program or activity under section 1557.

70.     As a covered entity, Dignity is barred by section 1557 from denying individuals the benefits of, or participation in, or subjecting them to discrimination on the grounds prohibited by section 504 the Rehabilitation Act of 1973, 29 U.S.C. § 794(a).

71.     Section 504 of the Rehabilitation Act prevents discrimination against a qualified individual with a disability based solely upon their disability.

72.     Plaintiffs E.W. and A.V have been diagnosed with ASD, a condition which substantially limits one or more of their major life activities including but not limited to caring for themselves, hearing, eating, speaking, learning, reading and communicating.

73.     Each are qualified individuals with a disability under the Rehabilitation Act of 1973.

74.     Similarly, most if not all individuals with ASD and other "developmental delay" conditions who seek medically necessary treatment for their conditions are qualified individuals with disabilities under Section 1557 and Section 504.

75.     Dignity has denied Plaintiffs and others coverage of medically necessary treatments under the Plan based solely upon their diagnosis with a disabling condition considered to be a "developmental delay" in violation of section 1557 of the ACA.

**B.     MENTAL HEALTH PARITY AND ADDICTION EQUITY ACT OF 2008 [MHPAEA]**

76.     MHPAEA does not require health plans to cover mental health benefits. However, if a group health plan does offer mental health benefits (and the Plan here does),

14

then MHPAEA must be followed.    MHPAEA has two separate and independent requirements:

> [1] The treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) **and**

> [2] there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

29 U.S.C. § 1185a(a)(3)(A)(ii) (bracketed numbers and emphasis added).    Both requirements are designed to prevent group health plan administrators and sponsors from designing or administering mental health benefits differently or more restrictively than medical/surgical benefits.  *David S. v. United Healthcare Ins. Co.*, No. 2:18-cv-803, 2019 WL 4393341, at *3 (D. Utah Sept. 13, 2019).

77.    Defendant's Developmental Delay Exclusion violates the MHPAEA, 29 U.S.C. § 1185a which is incorporated as an additional "term" into the Plan under ERISA. By failing to comply with the MHPAEA and the terms of the Plan as modified by the Parity Act, Dignity is systematically and uniformly failing to properly process claims and administer the Plan. As a result, the Plan's participants and beneficiaries have not received the benefits to which they are entitled to under the Plan or federal law.

78.    The Developmental Delay Exclusion explicitly excludes treatment for developmental mental health conditions when they are the "result" of something other than "acute illness or injury, or congenital defects amenable to surgical repair."  Facially, under the terms of the Plan, therapy services would be covered for conditions that result from a known surgical/medical causes or physical injuries, but not those same services needed to treat mental health conditions.

79.  As applied, the Developmental Delay Exclusion is used by Defendants to exclude therapy services needed by children to treat mental health conditions, including the

neurological/mental impairment resulting from Down Syndrome and cerebral palsy.  Based on information and belief, Defendants apply the Developmental Delay Exclusion solely or predominantly to mental health conditions, while, at the same time, the same or similar services are generally covered for medical/surgical conditions.

80.    Defendants also violated MHPAEA by failing to conduct an analysis of whether the Developmental Delay Exclusion complies with MHPAEA or, if such an analysis was conducted, by failing to provide the required disclosure upon multiple written requests by Plaintiffs.

81.    Specifically, MHPAEA requires Defendants to proactively undertake an extensive analysis of whether its exclusions and limitations comply with the law.  *See* 29 U.S.C. § 1185(a)(a)(8).  That analysis must be disclosed to participants and beneficiaries upon written request. 29 U.S.C. § 1024(b)(4); 29 U.S.C. §1185a(a)(4); 29 C.F.R. § 2590.712(d)(3).

82.    Plaintiffs, through their counsel, have repeatedly requested the Non-Quantitative Treatment Limitation analysis from Defendants, but have never received a response containing the analysis.

83.    Based upon the lack of responsive disclosures from Defendant, Plaintiffs assume that Defendant never conducted the required analysis.

### COUNT I - AS TO DEFENDANT DIGNITY

### Violation of the Affordable Care Act § 1557, 42 U.S.C. § 18116

84.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

85.    Claims brought under Section 1557 are eligible for injunctive and/or compensatory relief, including but not limited to the repayment of funds which Plaintiffs have already spent to acquire treatment.

86.     Defendant Dignity is a covered "health program or activity" which receives Federal financial assistance in the form of Medicaid and Medicare payments.  As the Plan Sponsor, Dignity designed the health benefits offered to its employees and their families.

87.     Section 1557, based upon the grounds of 504 of the Rehabilitation Act of 1973, prohibits an otherwise eligible individual from being denied benefits or subjected to discrimination from an entity or activity receiving federal financial assistance solely by reason of their disability.

88.     Plaintiffs are "otherwise qualified" individuals under § 504 of the Rehabilitation act and therefore Section 1557 because they have an impairment which substantially limits one or more of their major life activities.

89.     Benefit design "inherently involves intentional conduct." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 954 (9th Cir. 2020).

90.     Defendant Dignity discriminated and continue to discriminate against Plaintiffs and other individuals with conditions deemed "developmental delays" in at least the following two ways:

91.     *First,* by designing and administering the Plan to exclude coverage for "developmental delays," Defendant Dignity caused the Plan to deny Plaintiffs' coverage of their needed treatment based solely on their disability and intentionally discriminated against them in violation of section 1557 of the ACA.  Defendant Dignity continue to do so as to Plaintiff E.W.; and

92.     *Second,* to the extent Dignity claims that not all people diagnosed with "developmental delay" conditions are "qualified individuals with disabilities" such that the Developmental Delay Exclusion applies to disabled and non-disabled enrollees alike, the categorical exclusion is a "proxy" for individuals with disabling Developmental Delay conditions. *Schmitt,* 965 F.3d at 959.  Under the proxy analysis, the Developmental Delay Exclusion is also a form of intentional discrimination.

93.     Plaintiffs are therefore entitled to injunctive and other equitable relief, compensatory damages, including out-of-pocket costs and consequential damages.

## COUNT II

**CLAIM FOR RECOVERY OF BENEFITS, CLARIFICATION OF RIGHTS UNDER THE TERMS OF THE PLAN AND CLARIFICATION OF RIGHT TO FUTURE BENEFITS UNDER THE PLAN UNDER 29 U.S.C. § 1132(a)(1)(B)**

94.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

95.     This count is brought pursuant to 29 U.S.C. § 1132(a)(1)(B) against both Defendants.

96.     This section provides that a participant or beneficiary may bring action to "recover benefits due to him under the terms of his plan, to enforce his rights under terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

97.     Defendants denied claims for medically necessary therapies submitted by Plaintiffs in violation of the terms of the Plan.

98.     The Plan specifically extends coverage to treatment of ASD, including treatment for speech, occupational and physical therapies.  But in practice, the Plan denies the very same treatment under the general Developmental Delay Exclusion.

99.     The more specific language extending coverage for treatments for ASD controls and Defendant's denial of such coverage to Plaintiffs was improper, arbitrary and capricious.

100.    Plaintiffs are entitled to recover benefits due to them under the terms of the Plan. They are entitled to a declaration of present and future rights to coverage for the treatment of ASD.

101.    Additionally, the terms of the Plan include non-preempted provisions of substantive law, such as the requirements of MHPAEA.  Defendants have failed to comply

with the terms of the Plan, which include the requirements of MHPAEA and its implementing regulations.

102.     As explained above, the Developmental Delay Exclusion violates MHPAEA both facially and as applied and is therefore impermissible under the Federal Parity Act.

103.     Plaintiffs and similarly situated others are entitled to recover benefits due to them under the terms of the Plan as modified by MHPAEA. They are entitled to a declaration of present and future rights to coverage of medically necessary ST, OT and PT and other therapy services, evaluations and treatments necessary to treat their ASD and other developmental mental health conditions.

## COUNT III

## BREACH OF FIDUCIARY DUTIES PURSUANT TO 29 U.S.C. § 1104(a) AND §1129(a)(2)

104.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

105.     Dignity is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as the Plan Sponsor and the entity responsible for benefit design and payment for services provided under the Plan.  Dignity is also responsible for monitoring and overseeing the claims administrators appointed under the Plan.

106.     As an ERISA fiduciary, and pursuant to 29 U.S.C. § 1104(a), Dignity is required to discharge its duties "solely in the interest of the participants and beneficiaries" and for the "exclusive purpose of: (i) providing benefits to participants and their beneficiaries: and (ii) defraying reasonable expenses of administering the plan." Fiduciaries must do this with reasonable "care, skill, prudence and diligence" and in accordance with the terms of the plans they administer.  Fiduciaries must conform their conduct to a fiduciary duty of loyalty and may not make misrepresentations to its insureds.

107.    ERISA § 409(a), 29 U.S.C. § 1109(a), states, in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

108.    The terms of an ERISA plan include non-preempted provisions of substantive law, such as the requirements in the MHPAEA and the Affordable Care Act's Section 1557. Defendant has failed to comply with the terms of the Plan, which include the requirements of the MHPAEA and its implementing regulations and the ACA and its implementing regulations. Defendant violated its fiduciary obligations by failing to act in accordance with the documents and instruments governing the Plan.

109.    Defendant further breached its fiduciary duties by providing conflicting reasons for the denial of coverage and attempting to deprive Plaintiffs of all their rights to a full and fair review under the Plan.

110.    Defendant also breached its fiduciary duties by failing to provide the mandated "Non-Quantitative Treatment Limitation" analysis upon written request by Plaintiffs' counsel.

111.    With these acts and omissions, Defendant breached its fiduciary duties by failing to act "solely in the interest of the participants and beneficiaries" for the "exclusive purpose" or "providing benefits." Defendant further failed to utilize the "care, skill, prudence, and diligence" of a "prudent man" acting in a similar capacity. Defendant did not act in accordance with the Plan. Instead, Defendant elevated its own interests above the interests of plan participants and beneficiaries.

112.    As a direct and proximate result of Defendant breach of fiduciary duty, Plaintiffs have been denied coverage for medically necessary covered treatment, suffered losses and are entitled to relief under ERISA against Defendant.

113.    Plaintiffs seek the relief identified below to remedy this claim.

**COUNT IV**

**CLAIM FOR EQUITABLE RELIEF UNDER 29 U.S.C. § 1132(a)(3)**

114.   Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

115.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), provides that a participant or beneficiary may "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan." Plaintiffs and the class seek to enjoin Defendants from continuing to apply exclusions and limitations on all coverage of medically necessary therapy services to treat developmental mental health conditions. Plaintiffs and the class also seek to have Defendant provide the class with corrective notice and reformation of the relevant Plan documents.

116.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), further provides that a participant or beneficiary may obtain other appropriate equitable relief to redress violations of ERISA or enforce plan terms.   To the extent full relief is not available under 29 U.S.C. § 1132(a)(1)(B) or 29 U.S.C. § 1132(a)(2), then Plaintiffs and the class seek equitable remedies including, without limitation, unjust enrichment, disgorgement, restitution, and surcharge arising out of the failure to administer the terms of the Plan as modified by the Federal Parity Act and implementing regulations.

**COUNT V**

**VIOLATION OF ERISA AND MENTAL HEALTH PARITY DISCLOSURE REQUIREMENTS UNDER 29 U.S.C. § 1132(a)(1)(a)**

117.   Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

118.   Plaintiffs seek sanctions for up to $110 per day for Defendant Dignity's failure to produce or ensure the production of the "medical necessity criteria for both medical/surgical benefits and mental health and substance use disorder benefits, as well as the processes, strategies, evidentiary standards and other factors used to apply" the

1    Developmental Delay Exclusion.  *See* 29 U.S.C. § 1024(b)(4); 29 U.S.C. §1185a(a)(4); 29

2    C.F.R. § 2590.712(d)(3); 29 C.F.R. § 2520.104b-1; 29 C.F.R. § 2575.502c-1.

3        119.    If the required MHPAEA analysis was never conducted by Dignity, Plaintiffs

4    seek sanctions for its failure to undertake the required analysis.  Plaintiffs also seek

5    injunctive relief to require Defendant to undertake the MHPAEA analysis pursuant to 29

6    U.S.C. §1185a(8)(A), and to modify the Plan as necessary pursuant to such analysis,

7    including, without limitation, the removal of the Developmental Delay Exclusion.

8

9                          **DEMAND FOR RELIEF**

10        WHEREFORE, Plaintiffs demand judgment in their favor against Defendants as

11    follows:

12        1.    Certify this case as a class action, designate named plaintiffs E.W. and A.V.

13            as class representatives and designate the Arizona Center for Law in the Public

14            Interest, Anne Ronan and Sam Schnarch and Sirianni Youtz Spoonemore

15            Hamburger, Eleanor Hamburger, as Class Counsel;

16        2.    Enter judgment on behalf of Plaintiffs E.W. and A.V. and the class for losses

17            sustained due to the Defendants violation of Section 1557 of the ACA, failure

18            to pay Plan benefits, and breaches of fiduciary duties;

19        3.    Declare that Dignity may not design and cause to be administered benefits that

20            wholly exclude all treatment for "developmental delays" since such exclusions

21            discriminate on the basis of disability in violation of Section 1557 of the ACA;

22        4.    Declare that Defendants may not administer plan provisions, policies or

23            practices that wholly exclude or impermissibly limit therapy services to treat

24            developmental mental health conditions, since such exclusions and/or

25            limitations are not predominantly applied to substantially all medical/surgical

26            services.

27

28

                                  22

5.  Enjoin Defendants from further violations of the terms of the Plan as modified by the MHPAEA and implementing regulations and the ACA and its implementing regulations;

6.  Award Plaintiffs and the class damages in an amount to be proven at trial due to Dignity's discriminatory benefits design and due to the failure to provide benefits due under the Plan as modified by MHPAEA and its implementing regulations;

7.  Permanently enjoin Dignity, its agents, employees and successors from designing, administering or enforcing benefit designs that exclude coverage for developmental delay conditions in violation of the MHPAEA and section 1557 of the ACA;

8.  Award Plaintiffs disbursements and expenses of this action, including reasonable attorneys' fees and litigation costs, in amounts to be determined by the Court pursuant to 42 USC §1988 and 29 U.S.C §1132(g); and

9.  Grant such other relief as is just and proper.

RESPECTFULLY SUBMITTED this 19th day of August, 2021.

ARIZONA CENTER FOR LAW IN THE
PUBLIC INTEREST

By _____
Anne C. Ronan
Samuel Schnarch

SIRIANNI YOUTZ SPOONEMORE
HAMBURGER PLLC

By _____
Eleanor Hamburger
(Pro Hac Vice Application Pending)

*Attorneys for Plaintiffs E.W. and A.V. by and through their parents*